B. K. BELL, Respondent, v. WILLIAM LESLIE, Appellant.

Kansas City Court of Appeals, February 8, 1887.

1. PRINCIPAL AND AGENT—NEGLIGENCE OF AGENT—LIABILITY OF PRINCIPAL FOR.—In order to hold the principal liable for negligent acts of his agent, it must be shown that the relation of master and servant exists, and the burden of *proving* the relation is on the plaintiff.

2. NEGLIGENCE—WHAT CONSTITUTES THE LIABILITY OF OWNER OF A VICIOUS ANIMAL.—If a horse of vicious habits should be stolen, or even wrongfully taken under a claim of title, the person thus taking it, and not the real owner, would be liable to third persons, as its owner *while it remained* in *his possession*. So if an animal is *hired out*, and even if it is simply *lent*, for such time and in such a manner as to give the hirer or borrower exclusive control over it, *he* and *not the ultimate owner*, is liable in like manner. *Owners* are liable for the hurt done by the animal, even without notice of the propensity, if the animal is *naturally mischievous*; but if it is of a *tame* nature *there must be notice* of the vicious habit, and *proof* of such knowledge is absolutely necessary to the right of recovery.

APPEAL from Chariton Circuit Court, HON. C. HAMMOND, Special Judge.

*Reversed.*

Statement of case by the court.

This is an action to recover damages for injuries inflicted on plaintiff's race horse, "Jim Keyte," by a race horse, "Mollie Hubbard," the property of defendant, on the race track at the fair ground at Keytesville. The petition was in two counts. The first count alleged that the defendant was, on October 4, 1883, the owner and in possession of the mare, "Mollie Hubbard"; that she "was of an ungovernable, vicious, and dangerous disposition, and was in the habit of running away," all of which

facts the defendant well knew; "that plaintiff had properly and rightfully caused his horse, 'Jim Keyte,' to be on the said track on said day; that while said horse was on said track, the defendant knowing the dangerous disposition of his said mare, wrongfully caused or suffered his servants and employes, having said mare in charge, to take her on the track where the plaintiff's horse was; that said mare, in accordance with her said disposition as known to defendant, immediately became vicious and unruly, and ran into and against plaintiff's horse at full speed, striking said horse on the hind leg, thereby breaking the same," etc.

The second count was the same as the first count, with the exception, that the second count alleged " that the rider in charge of said mare for defendant, by reason of negligence and want of ordinary care on his, the rider's part, caused or permitted defendant's mare to run into and against plaintiff's horse," etc.

The answer was a general denial. The evidence showed that the plaintiff's horse was injured by being run into by the defendant's mare while they were both rightfully on the race track, mentioned in the petition. As to what caused the defendant's mare to run only two witnesses testified. The plaintiff testified: " As the mare came around, and about opposite the gate where the horses are taken in upon the track, Meyers stopped her and seemed to be tying a knot in the bridle rein, when she suddenly took a start at great speed around toward the ticket office and in the direction of my horse." Meyers, the rider of the mare, testified : " I had put the mare around the track once in a walk, with 'Roan Charlie.' Just as we got to the gate at the south end of the track where the stock is brought upon the track, a dog took after a loose mule, which started to run up behind us, and some one hallooed. We were near the starting post at the time, and the mare started to run."

As to the manner in which the collision took place

the same two witnesses alone testified. The plaintiff said, after having made statement already quoted: "He" (Meyers), "sat very low on the mare, nearly laying down, and sawed the bit in her mouth as if he did not care a cent what she did. She ran against my horse and broke its leg, and I killed him." Meyers, after stating that the mare started to run, said: "It was a down grade in front of me. I hallooed, 'Ho!' to the mare, and begun sawing the bit in her. mouth to stop her. There were a dozen horses on the track, some horses near the ticket stand ahead of me, and I. called out, 'clear the track!' Bell's horse was some seventy-five yards further up the track, and his rider, instead of going straight ahead on the track, as he should, he turned him to the right, with his head towards the fence, which brought his rump square into the track and across it. I tried to miss his horse, but the mare's right shoulder hit his rump and knocked him over, she nearly falling, too."

The defendant was the owner of the mare. The only witnesses who testified as to who had the possession and control of the mare at the time of the accident were Meyers, the rider, and the defendant. Meyers testified: "I was exercising, training and managing the mare, 'Mollie Hubbard,' at the time, for Jot Creson, of Randolph county." The defendant said: "About three or four months before this time I had let Mr. Jot Creson have 'Mollie Hubbard,' for her racing qualities, till the fall fairs were over. He had my permission to use the mare in all respects as if she had belonged to him. I had no control of her whatever. Creson paid for her keeping, training, and transportation. I gave him the privilege, and authorized him to take her when and use her as he pleased. At the date of the injury to Bell's horse she was in Creson's possession and under his control and management."

As to the defendant's mare being vicious, the evidence was as follows:

The plaintiff testified : "I know 'Mollie Hubbard ;' had seen her on the track. From what I had seen of her she was unruly." James Guthridge, the only other witness for the plaintiff, testified : "Have seen 'Mollie Hubbard' run two or three races. She was ridden by a boy. There was no trouble with her except to get her started. I think she had been trained this way to get the best of the start before beginning to run." Said witness also said, prior to the statements just quoted : "Do not know that she was vicious, or in habit of running away. She was stubborn about starting in a race ; would pull back, and get the wrong way; unless she got the advantage in the start, was hard to start." The defendant stated : "She was not vicious or dangerous ; was perfectly gentle ; my boys ride her, and my wife drives her ; had not heard of her running away before the accident to plaintiff's horse. I had known her six or eight years. In starting in a race, she would refuse to go, would pull back or go the wrong way until she got the best of it." Meyers testified : "I do not regard 'Mollie Hubbard' as a dangerous or vicious mare. She had started to run with me once before, but I soon got her under control. Have seen her run a number of races. Yes, sir, I am a brother-in-law to William Leslie. The mare was not vicious, but was kind and gentle." Robert Patterson testified : "I knew the mare, 'Mollie Hubbard,' and she was a gentle animal ; when running she would be bad to start until she got the best of it. Saw her run several races, was generally ridden by a small boy." There was no other evidence on this question. There was absolutely no evidence tending to show that the defendant knew that his mare had run away, or was predisposed to do so. The only evidence on that question was the statement made by Meyers at the close of his testimony : "Do not know that Leslie knew of her previous attempt a few days before to run away."

From a judgment in favor of plaintiff, the defendant has appealed.

SAM C. MAJOR and KINLEY & WALLACE, for the appellant.

I. The first instruction for plaintiff was wrong. It directed the jury to find a verdict for plaintiff if they found that defendant's mare was in the habit of running away, and was in the possession and under the sole control of another person than defendant at the time the injury was done. A person other than the owner having in control and being in possession of a vicious animal is liable for any damage caused by it in the exercise of its vicious habits. *Bard v. Yohn*, 25 Pa. 482; *Mitchell v. Cressweller*, 13 Com. B. 237; *Oxford v. Peter*, 28 Ill. 434; *Barnum v. Vandusen*, 16 Conn. 200; *Ward v. Brown*, 64 Ill. 307; *Rossell v. Cottom*, 31 Pa. St. 525.

II. There being no evidence whatever that the defendant wantonly or recklessly injured the horse of plaintiff, and it being conceded that both parties had equal rights upon the track at the time of the accident, plaintiff was not entitled to recover, and instruction number five should have been given on behalf of defendant. Meeks' *Damnum Absque Injuria*, sect. 120, and authorities there cited.

III. The verdict should have been set aside and a new trial granted, because there was no evidence even tending to show that defendant had any knowledge that the mare, "Mollie Hubbard," would run away, or was in the habit of running away, in fact there was no *scienter* proven by plaintiff. In an action to recover for injury from vicious habits of domestic animals the *scienter* on part of defendant must be shown, to entitle plaintiff to recover.

IV. The vicious propensities of domestic animals, for which their owners may be held responsible in damages, if any one is injured thereby, are such habits that lead them to attack mankind, or other animals; cer-

tainly running by a race horse, until now, was never before claimed to be a vicious habit.

V. The motion for a new trial should have been granted for misbehavior on the part of the jury. For each juror to name a certain sum and aggregate the whole and divide by twelve, is an improper mode of making a verdict. *Sawyer v. Railroad*, 37 Mo. 240; *Philips v. Stewart*, 69 Mo. 149; *Ellidge v. Todd*, 1 Humphrey (Tenn.) 43; 1 Am. Decisions, 38, *note*.

VI. While a juror may not impeach the verdict, yet if it can be proven by other means, the verdict should be set aside. *Prate v. Coffman*, 31 Mo. 71.

A. W. MULLINS with R. W. GOLDSBY, for the respondent.

I. The court did not err in giving plaintiff's *first* instruction. Besides it is too late for defendant to complain of it. His own instructions presented the case on the same theory. *Holmes v. Braidwood*, 82 Mo. 610; *Walker v. Owen*, 79 Mo. 563; *Whetstone v. Shaw*, 70 Mo. 575; *Nance v. Metcalf*, 19 Mo. App. 183; *Loomis v. Railroad*, 17 Mo. App. 340.

II. Defendant made Creson his *agent* with respect to the care and use of the mare, and defendant is liable for any damages done by the mare, while Creson was in charge of her. And if Creson at the time of the accident knew of the habits of the mare, he, too, was liable. Cooley on Torts, 684; 2 Hilliard Torts (3 Ed.) p. 292, sect. 9; Thompson on Neg. 217, 892; Story on Bailments, sect. 391.

III. There was sufficient evidence tending to show notice to the defendant of the vicious habits and disposition of the mare to authorize the submission of the question to the jury. Cooley on Torts, p. 344; 1 Thompson on Neg., p. 203, sect. 17. And under the evidence and all the circumstances in proof, the first instruction on the part of the plaintiff was properly given. The same attorneys who appear in this court for the defendant,

defended for him in the court below; and there, it seems, no demurrer was tendered to the plaintiff's evidence to justify the submission of the case to the jury, then their finding thereon is conclusive here. *Rosecrans v. Railroad*, 83 Mo. 678; *Roach v. Colbern*, 76 Mo. 653; *Gillespie v. Stone*, 43 Mo. 350; *Norton v. City of Moberly*, 18 Mo. App. 457.

IV. The court committed no error in refusing to set aside the verdict of the jury on the alleged ground of misbehavior on the part of the jury. And at most the evidence upon which that objection was predicated was conflicting and inconclusive as to the mode adopted by the jury to arrive at their finding. The presumption is in favor of proper conduct by the jury. *Clum v. Smith*, 5 Hill (N. Y.) 560; *The State v. Dieckman*, 11 Mo. App. 534, 545; *The State v. Cooper*, 85 Mo. 256.

## I.

HALL, J.—The mare, "Mollie Hubbard," was not in the possession or under the control of the defendant. Creson had full control of the mare. Meyers was the servant of Creson. He was not the servant of the defendant. The defendant was, therefore, not liable on account of any negligence on the part of Meyers in the management of the mare. No cause of action was proved under the second count of the petition. As to that count there was a total failure of proof. The burden of proving the relation of master and servant between the defendant and Meyers rested on the plaintiff. There was no presumption in favor of the existence of such relation simply from the fact that Meyers was handling and managing the mare, of which the defendant was the general owner. It was necessary for the plaintiff to at least prove, in order to create such a presumption, that Meyers was acting for the defendant.

## II.

Admitting, for the purpose of argument only, that

the defendant could on any ground be held liable for the injury inflicted by his mare to the plaintiff's horse, while said mare was in charge of Creson or Creson's servant, when the defendant had given the absolute control and right to the possession and management of the mare to Creson for the racing season; it must be conceded that the defendant could only be liable on one ground. That ground is, that the mare was unsafe and dangerous for the purposes for which the defendant gave her to Creson, even if she should be managed with care and prudence. If the mare could have been used for said purposes with safety, by the use of care and prudence, surely the defendant was not liable to a third person for having let her to Creson for such purposes. The defendant's liability may well be doubted. The rule on this subject has been thus illustrated: Thus, "if a horse of vicious habits should be stolen, or even wrongfully taken under a claim of title, the person thus taking it, and not the real owner, would be liable to third persons as its owner while it remained in his possession. So if an animal is hired out, and even, we think, if it is simply lent, for such a time and in such a manner as to give the hirer or borrower exclusive control over it, *he and not the ultimate owner*, is liable in like manner." Shear. & Red. on Neg., sect. 195.

It is not contended that a race horse is, from its nature, dangerous and unfit for the purposes of racing, when managed with care and prudence. No such case is alleged or proved. If the mare was unsafe and dangerous for such purposes it was by reason of a vicious disposition peculiar to herself. The burden of proving such vicious disposition and the knowledge thereof by the defendant rested upon the plaintiff.

It is clear that, although the mare may have been vicious in certain respects, still the defendant was not liable unless the injury complained of was occasioned by such viciousness. It is equally clear that the injury was caused by no viciousness on the part of the mare

except the vicious disposition to run away, if indeed the mare had such a disposition. Even if it be conceded that the disposition of the mare, "in starting in a race, to refuse to go, to pull back or go the wrong way until she got the best of it," was a vicious disposition, such disposition had nothing to do with causing the injury.

Did the mare have a disposition to run away? As we have said, it devolved upon the plaintiff to prove such disposition. The only evidence introduced by the plaintiff touching the mare's disposition was the testimony of the plaintiff that the mare was "unruly." In what respect the mare was "unruly" the plaintiff did not state. He simply made the bald statement that the mare was "unruly." The mare might have been "unruly" in starting in a race, as testified by witnesses for the defendant, or in many other respects, having nothing to do with causing the injury to plaintiff's horse. It devolved upon the plaintiff to prove that the mare was "unruly," in that she was disposed to run away, because the accident was caused by the mare running away. To prove that, the plaintiff's testimony had no tendency. The only other evidence bearing upon this question was the testimony of the rider, Meyers, to the effect that the mare had once before started to run with him, and that he soon got her under control. That testimony was not, alone, sufficient to prove that the mare, a *race horse*, was disposed to run away. And besides, that attempt on the part of the mare was made only a few days before the accident in suit, and long after the defendant had parted with the control of the mare; such testimony was not sufficient to prove that the mare was disposed to run away at the time the defendant so parted with her. There was, in our opinion, a failure of proof on the question.

But however that may be, it is certain that there was a total and absolute failure of proof as to the knowledge of the defendant, up to the time of the accident, that the mare was disposed to run away, or was in any

way uncontrollable except in starting in a race, as heretofore explained. Proof of such knowledge had by the defendant was absolutely necessary to the right of recovery by the plaintiff.

The rule upon this subject has been thus stated : " Owners are liable for the hurt done by the animal even without notice of the propensity, if the animal is naturally·mischievous, but if it is of a tame nature, there must be notice of the vicious habit. *Mason v. Keeling*, 12 Mod. Rep. 332 ; *Rex v. Huggins*, 2 Ld. Raym. 1574." *Spring Co. v. Edgar*, 99 U. S. 654 ; see also Moak's Underhill on Torts, (1 Amer. Ed.) page 294 ; Cooley on Torts, pages 342, 344 ; 1 Thomp. on Neg. p. 201, sect. 15 ; Wharton on Neg., sects. 922 and 923 ; Shearman & Red. on Neg. sect. 188.

The language used by the court in *Spring Co. v. Edgar* (99 U. S. *supra*) applies with peculiar appropriateness to the facts of this case. The court said : "Domestic animals, such as oxen or horses, may injure the person or property of another, but courts of justice invariably hold that if they are rightfully in the place where the injury is inflicted the owner of the animal is not liable for such an injury, unless he knew that the animal was accustomed to be vicious ; and in suits for such injuries such knowledge must be alleged and proved, as the cause of action arises for the keeping of the animal after the knowledge of its vicious propensity."

There was, therefore, a total failure of proof as to the first count of the petition. It follows that the judgment of the circuit court is reversed. All concur.